1

2

3

4

5

6

7

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10   TARON DONNELL MADDOX,            )   Case No. SA CV 11-276-SP
                                      )
11              Petitioner,           )
                                      )   MEMORANDUM OPINION AND ORDER
12        v.                          )
                                      )
13   MIKE D. McDONALD, Warden,        )
                                      )
14              Respondent.           )
     _____)

15

16        This matter comes before the Court on Petitioner Taron Donnell Maddox's Petition

17   for Writ of Habeas Corpus by a Person in State Custody.  Petitioner challenges his

18   convictions and sentence on sufficiency of the evidence, sentencing error, and ineffective

19   assistance of counsel grounds.  All parties having consented to proceed before the

20   assigned magistrate judge, and with briefing completed, the matter is ready for decision.

21   For the reasons discussed below, the Petition will be denied and the action dismissed with

22   prejudice.

23                                    **I**

24                        **SUMMARY OF PROCEEDINGS**

25   **A.     State Court Proceedings**

26        On June 26, 2008, Petitioner was convicted of attempted murder (Cal. Penal Code

27   §§ 664, 187(a)) and assault with a firearm (Cal. Penal Code § 245(a)(2)).  Clerk's

28   Transcript ("CT") at 146, 150, 322.  The jury further found true that: (1) Petitioner

committed both crimes for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, or assist in criminal conduct by members of that gang (Cal. Penal Code § 186.22(b)(1)); (2) in committing the attempted murder in association with gang members with the intent to assist criminal conduct by gang members, Petitioner vicariously discharged a firearm causing great bodily injury (Cal. Penal Code §§ 12022.53(d), (e)(1)); and (3) in committing the attempted murder in association with gang members with the intent to assist criminal conduct by gang members, Petitioner vicariously discharged a firearm (Cal. Penal Code §§ 12022.53(c) and (e)(1)).  CT at 146-51, 236-38; Reporter's Transcript ("RT") at 788-92.

Petitioner was sentenced to five years in state prison for attempted murder, and 25 years to life for the accompanying gang-related firearm enhancement under Penal Code §§ 12022.53(d) and (e)(1), with the sentences to run consecutively.  CT at 316-17, 320-23.  The court stayed the sentence on the assault with a firearm count, struck the § 186.22(b)(1) gang enhancements for sentencing purposes only, and stayed the sentence on the §§ 12022.53(c) and (e)(1) firearm enhancement.  CT at 316-18, 320-22; RT at 798-805.

Petitioner appealed his conviction to the California Court of Appeal, which affirmed in an unpublished opinion.  CT at 315; Lodged Doc. No. 6.  He then filed for a petition for review in the California Supreme Court, which was summarily denied.  Lodged Docs. Nos. 7, 8.  Thereafter, he filed habeas corpus petitions in both the California Court of Appeal and the California Supreme Court, both of which were summarily denied.  Lodged Docs. Nos. 9, 10; Petition, Exhs. D, E.

**B.    Federal Court Proceedings**

On February 14, 2011, Petitioner, proceeding pro se, filed the instant Petition, pursuant to 28 U.S.C. § 2254, raising the following claims:

1.    The evidence was insufficient to support his convictions and their associated enhancements (Grounds One through Eight);

1    2.      The trial court erred in sentencing him (Ground Nine); and

2    3.      Petitioner's appellate counsel was ineffective (Ground Ten).

3  Petition at 6A-6F.

4                                    **II**

5                 **EVIDENCE PRESENTED AT TRIAL**

6        Since Petitioner is challenging the sufficiency of the evidence to support his

7  conviction, the Court has independently reviewed the state court record. *Jones v. Wood*,

8  114 F.3d 1002, 1008 (9th Cir. 1997). Based on its review, the Court adopts the following

9  statement of facts from the California Court of Appeal's decision as a fair and accurate

10 statement of the evidence presented at trial:

11        At the time this case arose, [Petitioner] was a 19-year-old postal

12        worker who lived with his family in Fontana and had saved enough money

13        to buy a new Cadillac. Most weekends he visited his cousin and her sons in

14        Long Beach, playing sports and video games with the boys. He had no

15        criminal record and enjoyed a reputation for honesty, hard work and

16        peacefulness. But he also ran with a bad crowd. Many of his friends were

17        members of the Naughty 'n Nasty Crips (2N), an African-American gang in

18        Long Beach. One day, [Petitioner] was in their company when they shot and

19        wounded Miguel Perez. The primary issue at trial was whether [Petitioner]

20        aided and abetted his buddies in carrying out a gang-related shooting, or, as

21        [Petitioner] claimed, he was merely an unwitting witness to their crimes.

22        According to the prosecution's evidence, the shooting stemmed from

23        an earlier incident involving Perez, an associate of the Hispanic gang Evil

24        Ways, and 14-year-old Jeremiah Webb, the younger brother of 2N member

25        Ezekiel "Zeke" Webb. Jeremiah had been skateboarding near his Garden

26        Grove apartment with his twin brother Joshua and their friend Addison Ngo.

27        As they played, they noticed Perez and other Hispanic juveniles spraying

28        graffiti near Ngo's apartment. Ngo and Jeremiah approached the juveniles

                                      3

1    and threatened to call the police if they didn't knock it off.

2        Perez responded by asking Ngo and Jeremiah where they were from, a

3    question often posed by gang members to determine a potential rival's gang

4    affiliation.  Jeremiah said he was from Long Beach, and Perez retorted he

5    was from Orange County.  Perez then retrieved a knife from his pocket,

6    grabbed Jeremiah's skateboard, and pushed him into the bushes.  The

7    incident ended by Perez throwing the skateboard to the ground and Jeremiah

8    fleeing to his nearby apartment with Joshua and Ngo.  However, that wasn't

9    the end of things.  At the apartment, Joshua said he wanted to get Perez for

10   what he did to Jeremiah.  Joshua then spoke with Zeke on the phone and told

11   him what had happened.  During their conversation, he asked for Zeke's

12   help in dealing with Perez.

13       Twenty minutes later, Zeke and [Petitioner] arrived at the apartment,

14   along with 2N members Keith Mason, Herbert Percy and Davion Hughes.

15   [Petitioner] had driven the group from Long Beach in his Cadillac.  When

16   they exited his car, Zeke was visibly angry and demanded to know Perez's

17   whereabouts.  Jeremiah pointed down the street to where Perez and his

18   friends were standing.  [Petitioner] then drove Zeke, Mason, Percy and

19   Hughes to that location.  They were followed on foot by a small crowd of

20   onlookers that included Jeremiah and Joshua.

21       [Petitioner] pulled up near Perez's group, parked his car and joined his

22   companions in confronting Perez.  Zeke asked Perez if he had a problem,

23   and a friend of Perez known as "Silent" belied his nickname by telling Zeke

24   not to make a scene.  Zeke said, "Somebody messes with my brother it's my

25   business."  He also warned Perez to take his hand out of his pocket.  When

26   Perez refused, Zeke turned to his pals and said "get off on him already."  At

27   that point, [Petitioner] pulled out a handgun and handed it to Mason, who

28   promptly shot Perez.  Mason tried to fire the gun again, but it jammed and he

4

was unable to do so.  He and his buddies then piled back into [Petitioner]'s car, and [Petitioner] drove them back to Long Beach.

According to the prosecution's gang expert Chris Zamora, it is highly unlikely gang members would ever allow a nongang member to accompany them in carrying out such a shooting.  While acknowledging [Petitioner] had no criminal record and was not a documented gang member, Zamora said it is important for the driver in a group to be aware of any potential criminal activity that may occur, so that he can be prepared to depart the scene in a hurry.  If the driver is not in the loop, he could easily leave some of the participants behind or balk when it came time to leave.  The fact that did not happen in this case suggested to Zamora that [Petitioner] was either a "strong associate" or "active member" of 2N and that he acted for the benefit of that gang.

In forming these opinions, Zamora also relied on the fact that [Petitioner] had Mason and Percy listed by their gang monikers in his cell phone, and his phone contained a picture of 2N graffiti.  In addition, when the police searched [Petitioner]'s car following the shooting, they found a brown bandana of the sort favored by 2N members and a backpack bearing the gang's graffiti.  While in jail, [Petitioner] also wrote a letter to a top 2N member that contained a plethora of gang references.

Zamora also pointed out that in the gang culture, fear -- interpreted as respect -- is the currency by which gangs increase their standing in the community.  Acts showing disrespect toward the gang must be met with an escalation of violence in order for the gang to maintain their respect.  And that would include any perceived slights against a gang member's younger sibling.  Although Zamora was not aware of any particular rivalry between 2N and the victim's gang, he said African-American and Hispanic gangs have been feuding in Southern California for decades.  He opined that once

1   word got out 2N gang members had shot a Hispanic gang member, the

2   gang's reputation for violence would be enhanced significantly.

3       Testifying in his own behalf, [Petitioner] did not deny knowing about

4   2N.  However, he insisted he has never been a member of that gang and had

5   no intention of helping its members on the day in question.  In fact, he said

6   he had no idea Zeke, Percy and Hughes were even gang members.  He said

7   they were just his friends, and he had never seen them sporting gang attire or

8   weapons.  He also said the graffiti-laden backpack found in his car belonged

9   to a friend of Percy or Hughes, and he didn't know the significance of the

10  bandana that was found in his glove compartment.  As

11  for the letter he wrote to the high-level 2N member while in jail, he claimed

12  it was just an attempt to get protection while he was in custody.

13      Describing the events leading up to the shooting, [Petitioner] testified

14  he was hanging out with Zeke, Mason, Hughes and Percy at Percy's house in

15  Long Beach when Zeke received a phone call from his brother Joshua.  After

16  the call, Zeke appeared sad and said Joshua had been jumped, or was about

17  to be jumped, by a rival gang member.  Zeke asked [Petitioner] for a ride to

18  Joshua's apartment, and [Petitioner] reluctantly agreed.  As they were

19  leaving, Mason, Hughes, and Percy decided to join them.

20      Along the way, [Petitioner] played the music in his car so loud he

21  couldn't hear any talking that may have been going on.  When they arrived

22  at Joshua's apartment building, he parked and got out with the others.  But

23  when Zeke walked over to Joshua, he stepped off to the side and could not

24  hear what they were saying.  Before long, some kids came up and announced

25  where Perez and his gang were located.  Zeke and the others ran to that

26  location, while [Petitioner] got in his car and followed them.  He parked his

27  car near the site of the confrontation, but rather than joining in, he stayed in

28  the car, cranked up his stereo and looked away.  After a few minutes, his

1  friends came running over to his car, and he drove them back to Long Beach.

2  [Petitioner] testified that, not only was he ignorant of what his friends

3  had done, he told them he didn't want to know, and they didn't talk about it.

4  Although he suspected something bad had happened, he did not want to be

5  part of it.  These claims notwithstanding, the prosecution proceeded on the

6  theory [Petitioner] aided and abetted the shooting by driving and handing the

7  gun to the shooter Mason.  Alternatively, the prosecution theorized the

8  charged crimes of attempted murder and aggravated assault were a natural

9  and probable consequence of the targeted offense of disturbing the peace.

10  The defense argued [Petitioner] was being prosecuted simply because

11  of his association with Zeke and the other gang members.  It claimed

12  [Petitioner] was neither aware of, nor involved in their crimes, and therefore

13  he was not criminally responsible for what occurred.  The jury convicted

14  [Petitioner] of all the charges and found the gang allegations to be true.

15  Lodged Doc. No. 6 at 2-5.

### III

### STANDARD OF REVIEW

18  This case is governed by the Antiterrorism and Effective Death Penalty Act of

19  1996 ("AEDPA").  AEDPA provides that federal habeas relief "shall not be granted with

20  respect to any claim that was adjudicated on the merits in State court proceedings *unless*

21  the adjudication of the claim –

22  (1) resulted in a decision that was contrary to, or involved an unreasonable

23  application of, clearly established Federal law, as determined by the Supreme Court of

24  the United States; or

25  (2) resulted in a decision that was based on an unreasonable determination of the

26  facts in light of the evidence presented in the State court proceeding."  28 U.S.C.

27  § 2254(d)(1)-(2) (emphasis added).

28  In assessing whether a state court "unreasonably applied" Supreme Court law or

1  "unreasonably determined" the facts, the federal court looks to the last reasoned state

2  court decision as the basis for the state court's justification. *Robinson v. Ignacio*, 360

3  F.3d 1044, 1055 (9th Cir. 2004).  Petitioner raised the claims in Grounds One through

4  Seven on direct appeal to the California Supreme Court, but that court summarily rejected

5  his petition for review.  Lodged Docs. Nos. 7, 8.  The California Court of Appeal

6  addressed the claims and issued a reasoned opinion.  Lodged Doc. No. 6.  Accordingly,

7  the Court of Appeal's opinion on January 13, 2010 stands as the last reasoned decision on

8  Grounds One through Seven. *See Hines v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).

9  Petitioner raised the claims in Grounds Eight, Nine, and Ten on collateral review

10  before the California Supreme Court, which summarily rejected the claims.  Lodged

11  Docs. No. 9, 10.  With respect to those claims for which there is no reasoned state court

12  decision, the federal habeas court will conduct an "independent review" of the record to

13  determine whether the state court decision was contrary to, or an unreasonable

14  application of, controlling United States Supreme Court precedent. *See Allen v. Ornoski*,

15  435 F.3d 946, 954-55 (9th Cir. 2006).  Even in the absence of a prior reasoned decision,

16  § 2254(d)'s limitations on granting habeas relief remain. *Harrington v. Richter*, __ U.S.

17  __, 131 S. Ct. 770, 784, 178 L. Ed. 2d 624 (2011) ("Where a state court's decision is

18  unaccompanied by an explanation, the habeas petitioner's burden still must be met by

19  showing there was no reasonable basis for the state court to deny relief.").

20  **IV**

21  **ANALYSIS**

22  **A.    Petitioner's Claims of Insufficient Evidence Do Not Merit Habeas Relief**

23  In Grounds One through Eight, Petitioner contends that the evidence presented at

24  trial was insufficient to support his attempted murder and assault with a firearm

25  convictions and his criminal street gang and gang-related firearm enhancements.  For the

26  following reasons, the Court does not agree.

27  In *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979),

28  the United States Supreme Court held that federal habeas corpus relief is not available to

a petitioner who claims that the evidence was insufficient to support his conviction unless he can show that, viewing the record in a light most favorable to the prosecution, "no rational trier of fact could have found proof of guilt beyond a reasonable doubt."  In evaluating such claims, the Court must presume, even if it does not affirmatively appear in the record, that the jury resolved any conflicting inferences in favor of the prosecution. *Wright v. West*, 505 U.S. 277, 296-97, 112 S. Ct. 2482, 120 L. Ed. 2d 225 (1992) (citing *Jackson*, 443 U.S. at 326).  The Court reviews the state court's decision "with an additional layer of deference," granting relief only when the state court's judgment was contrary to, or an unreasonable application of, the *Jackson* standard.  *Juan H. v. Allen*, 408 F.3d 1262, 1274-75 (9th Cir. 2005).  In applying the *Jackson* standard, the Court looks to state law to determine what evidence is needed to support a conviction of the crime charged.  *Jackson*, 443 U.S. at 324 n.16.  Finally, the Court will not re-weigh evidence, reassess witness credibility, or resolve evidentiary conflicts on habeas review; that is the province of the jury.  *See Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004) ("A jury's credibility determinations are . . . entitled to near-total deference under *Jackson*") (citing *Schlup v. Delo*, 513 U.S. 298, 330, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995)); *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995).

      1.    <u>Attempted Murder And Assault With A Firearm Convictions</u>

      At trial, the prosecution presented two vicarious liability theories – aiding and abetting, and natural and probable consequences – by which the jury could convict the Petitioner of attempted murder and assault with a firearm.  In Grounds Five through Eight, Petitioner contends that there was insufficient evidence to support convictions on either theory.  The Petitioner also argues in Ground Eight that his convictions should be reversed because his confederates acted in self-defense.  For the following reasons, the Court disagrees.

      a.    Aiding and Abetting

      Under California law, "a person who aids and abets the commission of a crime is a 'principal' in the crime, and thus shares the guilt of the actual perpetrator."  *People v.*

1  *Prettyman*, 14 Cal. 4th 248, 259, 58 Cal. Rptr. 2d 827, 926 P.2d 1013 (1996).  A person

2  aids and abets when he, "acting with (1) knowledge of the unlawful purpose of the

3  perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the

4  commission of the offense, (3) by act or advice aids, promotes, encourages or instigates,

5  the commission of the crime." *People v. Beeman*, 35 Cal. 3d 547, 561, 199 Cal. Rptr. 60,

6  674 P.2d 1318 (1984).  Factors that may be considered in determining whether a

7  defendant had this requisite knowledge and intent include "presence at the scene of the

8  crime, companionship and conduct before and after the offense, including flight." *People*

9  *v. Mitchell*, 183 Cal. App. 3d 325, 330, 228 Cal. Rptr. 286 (1986).

10      In rejecting Petitioner's claim, the Court of Appeal concluded:

11      "[Petitioner] was not only present at the scene of the shooting, he was there

12      with several other 2N members, and it was he who drove them there.  It is

13      clear they were looking to avenge Perez's prior assault against Zeke's

14      younger brother.  And when Zeke gave the command for his boys to 'get off

15      on' Perez, meaning shoot him, [Petitioner] pulled out a gun and handed it to

16      Mason.  Mason then shot Perez once and unsuccessfully attempted to shoot

17      him again.  After that, [Petitioner] drove Zeke, Mason and the others back to

18      Long Beach.  [¶]  It's hard to imagine a clearer case of aiding and abetting

19      than that. While [Petitioner] testified to an entirely different version of

20      events, the jury was not required to believe him.  And as stated above, we

21      must review the evidence in the light most favorable to the judgment below.

22      Doing so leads to the ineluctable conclusion [Petitioner] aided in the

23      shooting, knowing of Mason's unlawful purpose and with the intent to help

24      him accomplish it.

25  Lodged Doc. No. 6 at 7.

26      The Court agrees.  Given the evidence, a rational juror could conclude that

27  Petitioner played an active supporting role in the charged crimes.  He was with Zeke

28  Webb and three other friends when Webb learned that his younger brother, Jeremiah, was

having trouble with Hispanic gang members.  RT at 219-21, 564.  Petitioner's friends were members of another gang.  RT at 296-310.  At Webb's request, Petitioner drove the group to Webb's home in Garden Grove.  RT at 564-65.  When they arrived, Petitioner and his friends tracked down and confronted Jeremiah's alleged assailants.  RT at 139, 142, 173, 387, 412, 429.  At least two people saw Petitioner bring a gun to the scene and hand it to the shooter.  RT at 144, 433.  Petitioner admitted he drove the group back to Long Beach after the shooting.  RT at 576.

Viewing this evidence in the light most favorable to the prosecution and presuming that the jury resolved all conflicting inferences from the evidence against Petitioner, a rational juror could have found that (1) Petitioner knew that Mason, Zeke, and his other friends intended, at the very least, to disturb the peace, (2) Petitioner himself intended, before and during the commission of the crime, to aid and abet their efforts, and (3) Petitioner personally engaged in, and did in fact aid and abet, the commission of their crime.

In Ground Five, Petitioner also contends that there was insufficient evidence to support his convictions absent the gang allegations, and that the gang allegations were improperly admitted as they were not supported by sufficient evidence.  As set forth in Section IV.A.2.a below, the Court disagrees with the premise of Petitioner's argument: there was sufficient evidence to support the gang allegations.  And in any event, even without the gang allegations the evidence of Petitioner's aiding and abetting was more than sufficient.  Although the gang allegations may well have been a factor in the verdict, the evidence that Petitioner drove his friends to confront the assailant of Zeke Webb's younger brother, Webb commanded them to "get off on" the assailant, and Petitioner then handed over the gun provided ample basis for the jury to convict Petitioner without any consideration of the gang allegations.

As such, the state courts' rejection of Petitioner's claim was neither contrary to, nor an unreasonable application of, clearly established federal law.  Habeas relief is unwarranted.

b.      Natural and Probable Consequences

Petitioner further contends that "a reasonable person in [P]etitioner's position would not have known the instant shooting was 'a natural and probable consequence' of the offense of disturbing the peace." Petition at 6E. The Court disagrees.

Under California law, the liability of an aider and abettor extends beyond the target offense to the "natural and reasonable consequences of the acts he knowingly and intentionally aids and encourages." *Beeman*, 35 Cal. 3d at 560. To convict on such a theory, a jury must find (1) the prosecution proved the elements of aiding and abetting with respect to the target crime, (2) "the defendant's confederate committed an offense other than the target crime," and (3) "the offense committed by the confederate was a natural and probable consequence of the target crime that the defendant aided and abetted." *Prettyman*, 14 Cal. 4th at 262. This is an objective test; liability depends on whether, "under all of the circumstances presented, a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence" of the target offense. *See People v. Nguyen*, 21 Cal. App. 4th 518, 531, 26 Cal. Rptr. 2d 323 (1993).

It is undisputed that one of Petitioner's confederates shot Perez. As the state appellate court determined, a reasonable person in Petitioner's position should have known that the shooting was a foreseeable consequence of disturbing the peace, the alleged target offense:

> [A] reasonable person in [Petitioner]'s position would have foreseen that confronting a rival gang member about a perceived act of disrespect could easily escalate into violence. The sad truth is, that "[w]hen rival gangs clash today, verbal taunting can quickly give way to physical violence and gunfire." [Citation] And in that combustible context, "escalation of [the] confrontation to a deadly level [is] much closer to inevitable than . . . to unforeseeable." [Citation] . . . [T]here was evidence of a long-standing rivalry between African-American and Hispanic gangs in general. Moreover,

1    it is clear Zeke had a strong motivation to avenge the prior assault by Perez
2    on his younger brother. According to the gang expert, this would likely
3    necessitate an escalation in the violence; hence the decision to bring along
4    the gun. . . . All told, we are convinced that under the circumstances
5    presented, a reasonable person in [Petitioner]'s position would have known
6    assault with a firearm and attempted murder were natural and probable
7    consequences of the decision to confront Perez.

8    Lodged Doc. No. 6 at 8-9.

9    The Court agrees. Petitioner drove Webb and his friends, all of whom were known
10   gang members, from Long Beach to Garden Grove so that they could confront Jeremiah's
11   alleged attackers, who they believed to be Hispanic members of another gang. They
12   brought a gun along. Multiple witnesses testified that Petitioner handled the gun himself.
13   When the group arrived in Garden Grove, they pursued and confronted the victim and his
14   friends. A rational juror could have concluded, based on that evidence, that a reasonable
15   person in Petitioner's position would have known that assault with a firearm and
16   attempted murder were foreseeable outcomes of such a confrontation between gang
17   members, especially when the Petitioner himself brought a deadly weapon to the scene of
18   the confrontation. *See, e.g., People v. Montes*, 74 Cal. App. 4th 1050, 1056, 88 Cal. Rptr.
19   2d 482 (1999).

20   In light of the foregoing, the state courts' rejection of Petitioner's sufficiency of the
21   evidence claim was neither contrary to, nor an unreasonable application of, clearly
22   established federal law.

23              c. Self-Defense

24   Petitioner also contends in Ground Eight that his convictions "should be reversed
25   because the shooting of [the victim] was in the heat of passion and or during an imperfect
26   self-defense." Petition at 6E; Traverse at 43. Petitioner did not present this claim on
27   direct appeal, but he raised the issue in his state habeas petition. See Lodged Doc. No. 9
28   at 4-10. The California Supreme Court rejected the petition, and the claims in it, without

1   comment.  Lodged Doc. No. 10.  After reviewing the trial record, the Court concludes

2   that the dismissal was not unreasonable.  *Richter*, 131 S. Ct. at 784.

3        An intentional killing committed without malice is reduced to voluntary

4   manslaughter.  Cal. Penal Code § 192; *People v. Rios*, 23 Cal. 4th 450, 460, 97 Cal. Rptr.

5   2d 512, 2 P.3d 1066 (2000).  "Malice is presumptively absent when the defendant acts

6   upon a sudden quarrel or heat of passion on sufficient provocation or kills in the

7   unreasonable, but good faith, belief that deadly force is necessary in self-defense."

8   *People v. Lee*, 20 Cal. 4th 47, 59, 82 Cal. Rptr. 2d 625, 971 P.2d 1001 (1999) (internal

9   citation omitted).  When evidence of provocation or imperfect self-defense has been

10  presented, the prosecution has the burden of proving beyond a reasonable doubt the

11  absence of heat of passion or the absence of an imperfect self-defense in order for the

12  jury to find the malice element for murder.  *See Rios*, 23 Cal. 4th at 461-62.

13       To establish that a homicide occurred during the heat of passion, it must be proven

14  that the killer was sufficiently provoked.  *People v. Lasko*, 23 Cal. 4th 101, 108, 96 Cal.

15  Rptr. 2d 441, 999 P.2d 666 (2000).  Specifically, "[t]he provocation which incites the

16  defendant to homicidal conduct in the heat of passion must be caused by the victim, or be

17  conduct reasonably believed by the defendant to have been engaged in by the victim."

18  *People v. Manriquez*, 37 Cal. 4th 547, 583, 36 Cal. Rptr. 3d 340, 123 P.3d 614 (2005)

19  (internal citations omitted).  This is an objective test; provocation, whether physical or

20  verbal, must be such that "it would cause an ordinary person of average disposition to act

21  rashly or without due deliberation and reflection."  *Manriquez*, 37 Cal. 4th at 583-84.  As

22  a complete defense to murder, self-defense requires both an actual and a reasonable belief

23  in the need to defend against an imminent danger of death or great bodily injury.  *People*

24  *v. Humphrey*, 13 Cal. 4th 1073, 1082, 56 Cal. Rptr. 2d 142, 921 P.2d 1 (1996).  If a

25  defendant's actual belief in the need to defend against imminent death or great bodily

26  injury is objectively unreasonable, imperfect self-defense may apply to negate malice and

27  reduce the killing from murder to manslaughter.  *Id.*  Under either a theory of perfect or

28  imperfect self-defense, a defendant "must actually believe in the need to defend himself

14

against imminent peril to life or great bodily injury." *People v. Viramontes*, 93 Cal. App. 4th 1256, 1262, 115 Cal. Rptr. 2d 229 (2001).

Although some witnesses testified that they saw the victim carrying a knife-like instrument, others said the victim and his friends were unarmed. There was minimal evidence that the victim and his friends provoked the shooting. Rather, a rational juror could conclude, based on the evidence, that it was Petitioner and his confederates who provoked the near-fatal confrontation. The shooting occurred at least twenty minutes after the victim allegedly harassed Zeke Webb's brother. Petitioner and his friends pursued and tracked down the victim, the parties talked and the victim's friend tried to defuse the situation, and Petitioner's confederate did not start shooting until Zeke Webb told him to "get off on" the victim.

The verdict indicates that the jury simply rejected Petitioner's self-defense theory. That determination is entitled to significant deference on habeas review, and this Court will not re-weigh the evidence or reassess witness credibility. *See, e.g. Bruce*, 376 F.3d at 957; *Schlup*, 513 U.S. at 330 (credibility of witnesses is generally beyond the scope of review for sufficiency of the evidence); *United States v. Croft*, 124 F.3d 1109, 1125 (9th Cir. 1997) (appellate court is "powerless to question a jury's assessment of witnesses' credibility" when evaluating sufficiency of evidence claim). The jury's implicit finding – that Petitioner and his confederates failed to prove self-defense, imperfect or otherwise – is supported by the evidence and will not be disturbed.

2.    Sentencing Enhancements

a.    Criminal Street Gang Enhancements

In Grounds One through Three, Petitioner contends that the Penal Code § 186.22(b)(1) gang enhancements were not supported by sufficient evidence. For the following reasons, the Court finds that they were.

To sustain a gang enhancement under California law, the State must prove two "separate and distinct elements" beyond a reasonable doubt: first, that the defendant committed a felony "for the benefit of, at the direction of, or in association with [a]

criminal street gang"; and second, that the defendant committed the crime "with the specific intent to promote, further, or assist in any criminal conduct by gang members." Cal. Penal Code § 186.22(b)(1); *Bonilla v. Adams*, 423 Fed. Appx. 738, 739 (9th Cir. 2011); *see also People v. Gardeley*, 14 Cal. 4th 605, 616-17, 59 Cal. Rptr. 2d 356, 927 P.2d 713 (1996).

In *People v. Albillar*, 51 Cal. 4th 47, 119 Cal. Rptr. 3d 415, 244 P.3d 1062 (2010), the California Supreme Court discussed the evidence needed to prove these elements. "Expert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness" is sufficient to satisfy the statute's first prong. *Id.* at 63; *see also People v. Romero*, 140 Cal. App. 4th 15, 19, 43 Cal. Rptr. 3d 862 (2006) (holding expert opinion that "a shooting of any African-American men would elevate the status of the shooters and their entire [Latino] gang" was sufficient to support a jury's finding that shooting was committed to benefit the gang). "[S]ubstantial evidence establish[ing] that the defendant intended to and did commit the charged felony with known members of a gang" is sufficient to satisfy the statute's specific intent prong. *Albillar*, 51 Cal. 4th at 68; *People v. Villalobos*, 145 Cal. App. 4th 310, 322, 51 Cal. Rptr. 3d 678 (2006).

As the Court of Appeal observed in rejecting Petitioner's claim:

A gang motive was supplied by the prosecution's expert witness Zamora. He testified an attack on a gang member's younger sibling would be construed as an act of disrespect toward the gang itself. If the gang member did not respond to the act with violence, both he and his gang would lose respect. Based on this testimony, the jury could infer Zeke's command to shoot Perez was not simply a matter of family pride, but also a matter of saving face for his gang. As Zamora explained, gangs earn respect by committing acts of violence, and shooting a Hispanic gang member in a crowd of people would go a long way in terms of bolstering the street credentials of an African-American gang such as 2N.

Lodged Doc. No. 6 at 10.

The gang expert also testified that the shooting-generated status enhancement would help the 2N gang recruit new members and give it "access to wholesale drugs at a good price . . . access to more guns . . . access to more resources that Crip gang members have a right to within the gang culture." RT at 343. Given such clear evidence of gang benefit, a rational juror could conclude that Petitioner committed a felony "for the benefit of, at the direction of, or in association with" the 2N gang.

The evidence also supports a conclusion that Petitioner had the specific intent to "promote, further, or assist" in criminal conduct by 2N gang members. As noted above, committing a crime in concert with known gang members is substantial evidence which supports the inference that the defendant acted with the specific intent required by California's gang enhancement statute. *Albillar*, 51 Cal. 4th at 68; *see also Villalobos*, 145 Cal. App. 4th at 322. Every passenger in Petitioner's car that day was a 2N gang member. RT at 296-310. And although Petitioner maintains that he was not affiliated with the 2N gang, one could conclude from the evidence that he was familiar with 2N's colors, graffiti, hangouts, paraphernalia, leadership, and lingo. Finally, as the Court of Appeal noted, "[Petitioner] made the conscious choice to aid and abet the shooting when he handed the gun to Mason, whom he knew to be a 2N member." Lodged Doc. No. 6 at 10. Given this record, it was not unreasonable, nor contrary to established federal law, for the state appellate court to determine that the prosecution presented more than enough evidence to support the conclusion that Petitioner acted with the specific intent to promote, to further, or to assist 2N gang members in the charged crimes.

Petitioner contends that the gang enhancement was improper because the crime at issue was not gang-related. Petition at 6A; Traverse at 9. According to him, the shooting was "a personal matter in which Zeke Webb sought to protect his younger brother, Jeremiah, from neighborhood bullies." *Id.* Petitioner's argument on this point is misplaced. In *Albillar*, the California Supreme Court sought to "dispose[]" of the argument "that section 186.22(b)(1) requires the specific intent to promote, further, or assist *a gang-related* crime," holding instead that "the statute requires only the specific

1    intent to promote, further, or assist criminal conduct *by gang members*." *Albillar*, 51 Cal.

2    4th at 67.  This Court is bound by the state supreme court's interpretation of the law

3    governing this enhancement.  *Bradshaw v. Richey*, 546 U.S. 74, 76, 126 S. Ct. 602, 163

4    L. Ed. 2d 407 (2005) (per curiam); *Medley v. Runnels*, 506 F.3d 857, 862 (9th Cir. 2007);

5    *see also Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n*, 426 U.S. 482, 488,

6    96 S. Ct. 2308, 49 L. Ed. 2d 1 (1976) ("We are, of course, bound to accept the

7    interpretation of [State] law by the highest court of the State.").  And as described above,

8    there was sufficient evidence from which a rational juror could infer that Petitioner acted

9    with the specific intent to help his friends, all of whom were 2N gang members, commit

10   the charged crimes.

11        Finally, Petitioner claims that the gang enhancement was improper because he was

12   not a gang member.  Petition at 6B, Traverse at 22.  But the California Supreme Court has

13   held that a defendant need not be a gang member for the gang enhancement to apply to

14   him.  *See Albillar*, 51 Cal. 4th at 67-68 (holding that culpability under  section

15   182.66(b)(1) "does not depend on membership in a gang at all").  Furthermore, the

16   evidence strongly suggests that Petitioner had significant ties to the 2N gang.  Petitioner

17   had a 2N-colored gang bandana in his glove compartment, a backpack covered with

18   2N-related writings in his trunk, and pictures of 2N gang graffiti and 2N members listed

19   by gang moniker in his cell phone.  While he was in jail, Petitioner wrote a letter to a

20   known 2N gang leader asking for protection that was full of 2N-related gang references.

21        For the foregoing reasons, the Court concludes that the state appellate courts'

22   rejection of Petitioner's challenge to the gang enhancements was not contrary to, nor an

23   unreasonable application of, clearly established federal law.

24

25              b.    Firearm Enhancements

26        In Ground Four, Petitioner contends that there was insufficient evidence to support

27   his gang-related firearm sentencing enhancements.  This claim is without merit.

28        Petitioner acknowledges that this argument is closely related to his gang

enhancement argument.  Traverse at 28-29 ("Petitioner challenges the firearm enhancements which are dependent upon the gang finding pursuant to [Penal Code] section 12022.53, subdivision (e)(1)(A).").  To prove the gang-related firearm enhancement for which petitioner was sentenced to 25-years-to-life, under §§ 12022.53(d) and (e)(1), the prosecution was required to prove, in addition to the gang enhancement's elements, that (1) a principal in the crime intentionally discharged a firearm while committing the crime and (2) the discharge caused great bodily injury to another person.  Cal. Penal Code §§ 12022.53(d), (e)(1).  To prove the gang-related firearm enhancement on which Petitioner's sentence was stayed, the prosecution was required to prove, in addition to the gang enhancement's elements, that a principal in the crime intentionally discharged a firearm while committing the crime.  Cal. Penal Code §§ 12022.53(c), (e)(1).

As noted above, the prosecution met its burden on the gang enhancements.  The Court also finds that a rational juror could determine that the firearm enhancements' remaining elements were met.  Mason, one of Petitioner's confederates, shot the victim. The bullet passed through the victim's penis and exited through his rear end.  RT at 43. The victim spent two days in the hospital.  RT at 45-46.  Thus, the Court concludes that the state appellate courts' rejection of Petitioner's sufficiency of the evidence challenge to the gang enhancement was not contrary to, nor an unreasonable application of, clearly established federal law.

Finally, although the issue was not raised by either party or by the state appellate courts on direct or collateral review, the Court notes that the jury Finding form for the gang-related firearm enhancement contains an omission.  The Finding form indicating that the jury found true the allegations that Petitioner vicariously discharged a firearm while attempting to commit murder, and in doing so caused great bodily injury, lists the enhancement as codified in California Penal Code § "12022.53(d)(e)(1)."  CT at 148.  In fact, the enhancement is more clearly described as found in Penal Code §§ 12022.53(d) and (e)(1).  Subsection (d) provides for an additional sentence of 25 years to life when a

1    person, during the commission of one of the specified felonies, "intentionally discharges

2    a firearm and proximately causes great bodily injury."  Cal. Penal Code § 12022.53(d).

3    The language "discharged firearm causing great bodily injury" appears on the jury

4    Finding form for this enhancement here.  CT at 148.

5         But subsection (e)(1) of § 12022.53 goes on to state that the sentencing

6    enhancements provided for in the section shall only apply to one who is a principal in the

7    offense but who did not personally discharge the firearm when, inter alia, the following is

8    pled and proved:  "[t]he person violated subdivision (b) of Section 186.22."  Cal. Penal

9    Code § 12022.53(e)(1)(A).  As discussed above, Penal Code § 186.22(b) is violated by a

10   person who commits a felony "for the benefit of, at the direction of, or in association with

11   any criminal street gang, with the specific intent to promote, further, or assist in any

12   criminal conduct by gang members."  Cal. Penal Code § 186.22(b)(1).  Although the

13   Finding form refers to subsection (e)(1) of § 12022.53, neither the gang elements nor any

14   reference to § 186.22(b) appears on the Finding form that supports the gang-related

15   enhancement for discharge of a firearm causing great bodily injury in violation of

16   §§ 12022.53(d) and (e)(1) – the enhancement supporting the 25 years to life sentence

17   actually imposed by the trial court.  *See* CT at 148.  By contrast, the gang elements do

18   appear on the Finding form that supports the gang-related enhancement for discharge of a

19   firearm (<u>not</u> causing great bodily injury) in violation of §§ 12022.53(c) and (e)(1) –

20   which sentence enhancement the trial court stayed.  *See* CT at 149.

21        The omission of any reference to the gang elements of § 186.22(b) from the

22   Finding form appears clearly to have been an error.  Nonetheless, the Court finds this

23   error harmless, for two reasons.  First, the jury did return a separate true finding on the

24   § 186.22 gang enhancement allegation, and thus Pettiioner's violation of § 186.22(b)(1)

25   was pled and proved, as required by § 12022.53(e)(1).  *See* CT at 147.  And second,

26   jurors received proper instruction on the elements of each offense and enhancement

27   allegation, including on the gang elements required to find the enhancement under

28   §§ 12022.53(d) and (e)(1).  *See* CT at 219-20.  Under these circumstances, there is no

ambiguity that the jury found the required elements, and the omission from the jury Finding form does not warrant habeas relief.  *See Goins v. McDonald*, 2009 WL 4048601, at *11 (E.D. Cal. Nov. 20, 2009) (holding typographical errors on a verdict form was harmless error when jurors were correctly instructed on the charged enhancements); *Racca v. Cate*, 2009 WL 1834205, at *1 n.3 (C.D. Cal. May 11, 2009) (holding typographical error on verdict form was harmless error where substantive law was correctly stated, but cited Penal Code section was incorrect); *United States v. Gross*, 2008 WL 4559851, at *5 (holding error on verdict form did not merit habeas relief when there was no inconsistency between elements in indictment and those in jury instructions).

**B.  Petitioner's Claim of Sentencing Error Does Not Merit Habeas Relief**

In Ground Nine, Petitioner claims that the trial judge erred in sentencing him. Petition at 6F.  Specifically, he contends that the judge "did not have authority to impose the 25 years to life sentence because the jury found the gang enhancement under Penal Code section 186.22(b)(1)," which "carries a sentence of years not life."  *Id*.  This claim fails for two reasons.

First, Petitioner has misinterpreted his sentence.  He was not sentenced for violating Penal Code § 186.22(b).  Although the jury found true the § 186.22(b)(1) gang enhancement allegations, the trial judge struck those allegations for sentencing purposes. RT at 799, 801.  Instead, Petitioner was sentenced to 25-years-to-life for violating Penal Code §§ 12022.53(d) and (e)(1), as discussed above.

Second, a state court's violation of its own sentencing laws – which is what Petitioner alleges happened here – is not cognizable on federal habeas review.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991) (holding mere errors in the application of state law are not cognizable on habeas corpus). Even assuming that it was, "[a]bsent a showing of fundamental unfairness, a state court's misapplication of its own sentencing laws does not justify federal habeas relief." *Christian v. Rhode*, 41 F.3d 461, 469 (9th Cir. 1994).  Petitioner has not demonstrated

how his sentence was fundamentally unfair.  His claim, therefore, is without merit.

## C. **Petitioner's Claim of Ineffective Assistance of Appellate Counsel Does Not Merit Habeas Relief**

In Ground Ten, Petitioner claims that his appellate counsel was ineffective for not raising Grounds Eight and Nine on direct appeal.  Petition at 6F.  For the following reasons, the Court does not agree.

The Sixth Amendment right to counsel guarantees not only assistance, but effective assistance, of counsel.  *See Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  In order to prevail on a claim of ineffective assistance of counsel, Petitioner must establish two things: (1) counsel's performance fell below an "objective standard of reasonableness" under prevailing professional norms; and (2) the deficient performance prejudiced the defense, i.e., "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 687-88, 694.

Appellate counsel has no constitutional duty to raise issues that have little or no likelihood of success.  *Jones v. Barnes*, 463 U.S. 745, 751-53, 103 S. Ct. 3308, 77 L. Ed. 2d 987 (1983).  In fact, as an officer of the court, appellate counsel is under an ethical obligation to refrain from wasting the court's time with meritless arguments.  *McCoy v. Court of Appeals*, 486 U.S. 429, 436, 108 S. Ct. 1895, 100 L. Ed. 2d 440 (1988).

Petitioner's sufficiency of the evidence claims, including those in Ground Eight, have no merit.  The Ground Nine claim is premised on Petitioner's misinterpretation of his sentence, as noted above.  Neither claim warrants relief.  The failure to raise such meritless claims on appeal cannot constitute ineffective assistance.  *See Wildman v. Johnson*, 261 F.3d 832, 840 (9th Cir. 2001).  Thus, Petitioner's claim that he received ineffective assistance of appellate counsel necessarily fails.

# V

## CONCLUSION

IT IS THEREFORE ORDERED that Judgment shall be entered denying the Petition and dismissing this case with prejudice.

DATED: November 4, 2011

_____
SHERI PYM
United States Magistrate Judge